**UNITED STATES OF AMERICA**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**EMPLOYER REINSURANCE CORPORATION,**

     **Plaintiff,**

**v.**                                          **Case No.: 8:03-cv-1650-T-17MSS**

**LAURIER INDEMNITY COMPANY,**

     **Defendant.**

_____/

<u>**REPORT AND RECOMMENDATION**</u>

**This comes** before the Court for Consideration of Defendant's Motion for Summary
Judgement (Dkt. 71), Plaintiff's Motion for Summary Judgment (Dkt. 72) and the respective
responses thereto.  The Undersigned held a hearing during which the parties presented
oral argument in support of their respective positions.

**Background**

Plaintiff, a reinsurance company, filed this suit seeking declaratory relief pursuant
to 28 USC §§ 2201 and 2202.  Specifically, Plaintiff is seeking declaratory relief regarding
two Reinsurance Certificates it issued to Defendant in 1996 and 1997.[1]  Defendant is an
insurance company and subsidiary of Extendicare.[2]  In 2002, Defendant voluntarily settled

---

[1] The certificates at issue are Reinsurance Certificate Number FCO-0570736-03-1996 to January
1, 1996 to January 1, 1997 (the "1996 Certificate") and Reinsurance Certificate Number FCO-0583854-
00-1997 in effect from January 1, 1997 to January 1, 1998 (the "1997 Certificate"). Collectively, the
"Reinsurance Certificates."

[2] Extendicare, Inc., Extendicare Health Services, Inc. and Extendicare Health Facilities, Inc. are
collectively referred to as "Extendicare."  Extendicare owns Defendant, Laurier Indemnity Company.
Defendant provides property and casualty insurance for Extendicare's United States health care
operations.  Laurier outsourced all of its insurance, reinsurance and claims functions to another
Extendicare subsidiary, the Northern Group, Inc..

a wrongful death and negligence case filed in State court by the Estate of Georgia Wheeler Lindsay (the "Lindsay Claim").[3]   Plaintiff in the Lindsay Claim alleged that the decedent, Georgia Wheeler Lindsay, sustained injuries and ultimately died as a result of the negligent care and treatment she received while a resident in Extendicare's nursing home facility, Alpine Health and Rehabilitation Center ("Alpine Health"), from April 10, 1996 through August 23, 1999.

Upon settlement of the Lindsay Claim, Defendant sought indemnification in the amount of $1.5 million from Plaintiff pursuant to the Reinsurance Certificates.  Plaintiff denies that it owes any duty to indemnify Defendant based on the terms, conditions, limitations and exclusions in the Reinsurance Certificates.  Plaintiff further contends that the manner in which Defendant allocated payment of the settlement sum was a breach of the duty of good faith owed to Plaintiff in the handling and settlement of the Lindsay Claim. As a result of this dispute, Plaintiff alleges it is in doubt as to its obligations under the provisions of the Reinsurance Certificates and seeks a judicial determination of rights. Having completed discovery in this matter, the parties submitted cross motions for summary judgment, each contending that no factual dispute precludes entry of judgment in their favor, but that facts abound to preclude judgment in favor of the other.

## Analysis

### A.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

---

[3]The underlying case, filed on April 11, 2001 is Lindsay v. Extendicare, Inc., et al., Pinellas County, Sixth Circuit Case No. 01-003258C1.

as a matter of law." Fed. R. Civ. P. 56(c).  Initially, the moving party bears the burden of showing the Court, by reference to materials on file, that there is an absence of a genuine issue as to any material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A fact is material if it might affect the outcome of the lawsuit and a dispute about a material fact is "genuine" when there is sufficient evidence for a reasonable jury to return a verdict in favor of either party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  When the moving party has met its burden, the non-moving party must then "go beyond the pleadings" and cite to specific facts that show a genuine issue for trial through an affidavit, depositions, answers to interrogatories or admissions on file.  <u>Celotex Corp.</u>, 477 U.S. at 324.

In determining whether to grant summary judgment, the Court must view the evidence and inferences drawn from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988); <u>WSB-TV v. Lee</u>, 842 F.2d 1266, 1270 (11th Cir. 1988). The Eleventh Circuit has explained that:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted].  The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts.  When more than one inference can be reasonably drawn, it is for the trier of fact to determine the proper one.

<u>Id.</u>

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant the summary judgment motion.  <u>See</u> <u>Augusta Iron & Steel</u>

Works, Inc., 835 F.2d at 856.  In ruling on a motion for summary judgment, the Court does not weigh conflicting evidence or make credibility determinations.  Stewart v. Booker T. Washington Ins., 232 F.3d 844, 850 (11th Cir. 2000).

**B.    Undisputed Facts**

1.    Extendicare operates nursing homes, assisted living facilities and retirement centers throughout the United States, including Alpine Health.  Defendant, Extendicare's insurer, is a wholly owned subsidiary of Extendicare.  As Extendicare's insurer, Defendant provided property and casualty insurance for Extendicare's operations throughout the United States.

2.    The entirety of Defendant's insurance, reinsurance and claims functions were outsourced to another partially owned Extendicare subsidiary, the Northern Group, Inc. (the "Northern Group").  The Northern Group acted as Defendant's agent for negotiating the purchase of the Reinsurance Certificates and for the purpose of management and settlement of claims involving Defendant's coverage and reporting claims to Defendant's reinsurers, including Plaintiff.

3.    Throughout the relevant period, 1996 through 1999, the Northern Group arranged for Defendant to issue primary general and professional liability insurance policies to Extendicare.  Specifically, Defendant issued an umbrella liability policy, Policy Number 96UXL-00207, to Extendicare with limits of Twenty-Five Million Dollars ($25,000,000) each occurrence and in the aggregate, in excess of One Million Dollars ($1,000,000) for the period of January 1, 1996 to January 1, 1997, and also for the period January 1, 1997 to January 1, 1998. (Dkt. 38, Amend. Compl, ¶ 6; see also Exs. A and B).  Defendant also issued an umbrella policy to Extendicare for the period of January 1, 1998, to January 1, 2000.  (Dkt. 38, Amend. Compl., Ex.

4

E) .

4.      For the annual periods of 1996 and 1997, Plaintiff provided reinsurance coverage for Defendant's umbrella policy.   Specifically, Plaintiff issued the Reinsurance Certificates. (Dkt. 38, Amend. Compl., Exs. C and D).

5.      In 1998, Northern Group changed reinsurance providers, switching from Plaintiff to Swiss Reinsurance America Corporation ("Swiss Re").   The Swiss Re policy of reinsurance was in effect from January 1, 1998 to January 1, 2000. (Dkt. 38, Amend. Compl., Ex. F).

6.      In early April 1996, Ms. Georgia Wheeler Lindsay was admitted to Alpine Health, an Extendicare operated facility, where she remained in primary residence until late August 1999. (Dkt. 38, Amend. Compl., ¶ 15 and 17).

7.      Ms. Lindsay died on August 24, 1999, shortly after leaving Alpine Health.

8.      In April 2001, Alpine Health received a Notice of Intent to Sue from M.J. McDonald, Esq., of Wilkes & McHugh, P.A.. (Ex. 13, Letter to Swiss Re from Ms. Fitzpatrick dated May 9, 2001, attaching the April 30, 2001, Notice of Intent to Sue).

9.      On April 30, 2001, the Lindsay Claim was filed in Pinellas County, alleging that decedent, Ms. Lindsay, sustained injuries and ultimately died as a result of alleged negligent care and treatment while a resident of Alpine Health.  (Dkt. 38, Amend. Compl., ¶ 18 and 19).

10.     Upon receipt of the Lindsay Claim, the Northern Group initiated an investigation and initially assigned one of its claim representatives, Ms. Jennifer Fitzpatrick, to handle the pre-suit phase of the case.  (Fitzpatrick Depo. at 14).

11.     In May of 2001 Ms. Fitzpatrick transferred the claim file to Mr. David Zabler, a Northern Group employee. Mr. Zabler's supervisor was Phillip Cook, a consultant

to the Northern Group responsible for claims management.  (Cook Depo. at 6-7, 41, 308-09).   Upon evaluation, the initial case reserve was set at $300,000. (Cook Depo. at 14).

12.   In May 2001, Swiss Re was notified of the Lindsay Claim.  (Plaintiff's In Camera Statement of Disputed Facts, ¶ 15; Ex. 13, Letter to Swiss Re from Ms. Fitzpatrick dated May 9, 2001).

13.   In July 2001, plaintiff in the underlying Lindsay Claim requested insurance coverage information from Alpine Health for the years 1996 and 1997.

14.   In September 2001, while responding to interrogatories in the Lindsay Claim litigation, plaintiff in the Lindsay Claim responded that 1996 is the year in which certain alleged harm occurred to Ms. Lindsay.  (Ex. 24; Cook Depo. 401-02).

15.   On October 26, 2001, Donna J. Fudge, an attorney at Hill, Ward & Henderson representing Alpine Health, sent  a detailed Initial Case evaluation to Mr. Zabler in which acts occurring in 1996 were referenced. Ms. Fudge recommended settling the case for $800,000. (Ex. 19; Fudge Depo.180-181).

16.   After receiving Ms. Fudge's report, Defendant increased the case reserve for the Lindsay Claim to $1.5 million dollars. (Cook Depo. 34-35; Zabler Depo. 243, 365-366).

17.   In November 2001, the parties to the Lindsay Claim litigation had an initial mediation during which plaintiff demanded Fifteen Million dollars ($15,000,000.00) to settle the case. Defendant made a counter-offer of $50,000, which was rejected and the mediation came to an impasse.  Following the mediation, Northern Group raised its reserves to $1.5 million. (Ex. N, Nov. 12, 2001, e-mail from Northern Group to Swiss Re).

18.   In January 2002, plaintiff in the Lindsay Claim asserted a claim for punitive damages. (Ex. 16).

19.   On January 28, 2002, Ms. Fudge sent Defendant a deposition report that included the potentially damaging testimony of a former nurse, Mary Chubaty, who had worked at Alpine Health only in 1996.

20.   On February 15, 2002, plaintiff in the Lindsay Claim filed a proffer of deposition testimony in support of the motion for punitive damages previously filed. The proffer relied heavily on the testimony of Ms. Chubaty about 1996 events. (Fudge Depo. 206-218).

21.   On March 6, 2002, a hearing was held on the Lindsay Plaintiff's Motion to Add Punitive Damages. During the hearing, the Lindsay Plaintiff presented a notebook labeled "Exhibits and Violations." (Ex. 27; Fudge Depo. 199-205). In the Exhibits and Violations notebook the Lindsay Plaintiff presented evidence of problems from 1996, and, during the hearing many 1996 acts were alleged. (Ex. 28; Fudge Depo. 220-222). The Lindsay plaintiff's Motion to Add Punitive Damages was granted.

22.   Plaintiff was provided with notice of the Lindsay Claim no later than March 28, 2002, via a litigation status report sent from Defendant. (Ashley Depo. at 18-19, 183).

23.   Plaintiff was provided with notice that the 1996 Certificate would be implicated as part of the Lindsay Claim settlement no later than May 3, 2002. (Ex. 56).

24.   In May 2002, Defendant settled the Lindsay Claim for approximately $6 million dollars.

25.   Without the consent or approval of Plaintiff, Defendant agreed with the Lindsay Plaintiff to allocate Two Million Five Hundred Thousand Dollars ($2,500,000) of the Lindsay Claim settlement to damages allegedly sustained by Ms. Lindsay as a result

of alleged acts or omissions of Extendicare in 1996. (Dkt. 38, Amend. Compl., ¶ 26).

(See also, Ex. S to Plaintiff's In Camera Statement of Undisputed Facts which is

a copy of the final allocation spreadsheet prepared by Cook).

26.    Defendant thereafter demanded that Plaintiff indemnify it for One Million Five

Hundred Thousand Dollars ($1,500,000) of the allotted settlement.[4] (Dkt. 38,

Amend. Compl., ¶ 25 and 42).

27.    Paragraph V of the 1996 Reinsurance Certificate titled "Claims" provides that

Defendant, referred to as the "Reinsured," will:

> [G]ive prompt notice to the Corporation [Plaintiff] of any occurrence,
> medical incident, event or development, including any change in the
> Reinsured's applicable loss reserves, which, in the judgement of the
> Reinsured, might result in a claim for indemnity hereunder, and will
> forward promptly the [Plaintiff] copies of such pleadings and reports of
> investigation as may be requested by [Plaintiff]. The Reinsured shall
> notify the corporation of any offer of settlement which exceeds the
> Reinsured's retention whether received by, or to be made by the
> Reinsured, in advance of the Reinsured's accepting or making any
> such offer.

(Dkt. 38, Amend. Compl. ¶ 29 and Ex. 1).

28.    Paragraph V of the 1996 Certificate also provides, in pertinent part that, "[Plaintiff]

shall have the right, at its own expense, to participate jointly with the Reinsured in

the investigation, adjustment or defense of claims to which, in the judgment of

[Plaintiff], it is or might become exposed." (Dkt. 38, Amend. Compl., ¶ 37).

29.    Neither of the Reinsurance Certificates contains a "follow the forms/follow the

fortunes/follow the settlements clause (hereinafter referred to as "follow the

---

[4]The indemnity amount demanded differs from the amount allocated because for the years 1996
and 1997, Defendant bore the first $1,000,000 of risk for each year, and Plaintiff bore the risk of loss for
claims in those years in excess of $1,000,000. (Cook Depo. 37-38; 134-35, 520).  Even with this
explanation, the maximum indemnity that could properly be demanded based on the settlement and the
terms of the policies is disputed by Plaintiff.

fortunes"). (Dkt. 38, Amend. Compl., Exs. C and D)).[5]

## C.    Discussion

Plaintiff contends that it is entitled to summary judgment on two issues.   First, Plaintiff contends that by failing to provide prompt notice of the Lindsay Claim Defendant forfeited its right to coverage under the Reinsurance Certificates.   Second, Plaintiff contends that it is not bound to follow Defendant's allocation theory in connection with the settlement of the Lindsay Claim.   Further, where, as here, Plaintiff contends the allocation is facially self serving and not made in good faith, it argues that it is not bound to indemnify Defendant in any amount.

In the event that the Court does not grant summary judgment in its favor, Plaintiff asks the Court to grant partial summary judgment on two issues.   First, Plaintiff asks the Court to find that the follow the fortunes doctrine does not apply to this case because its Reinsurance Certificates do not contain such clauses and the doctrines cannot, as matter of law, be implied into reinsurance contracts.   Secondly, Plaintiff seeks a determination from the Court that if it proves Defendant's notice of the claim was untimely a presumption would arise that it was prejudiced, which would shift to Defendant the duty to disprove prejudice.

Defendant responds that Plaintiff is not entitled to summary judgement on these

---

[5] The "follow the fortunes" refers generally to contractual provisions pursuant to such that a reinsurer must accept the decisions of the insurer in underwriting and settling of claims absent <u>deliberate</u> deception, <u>gross</u> negligence or <u>recklessness</u>.  This doctrine is also referred to as the follow the settlements doctrine, and some courts use the terms follow the fortunes and follow the settlements interchangeably.   <u>See, e.g.</u>, <u>Stonewall Ins. Co. v. Argonaut Ins. Co.</u>, 75 F.Supp.2d 893, 897 (N.D. Ill. 1999) (noting that the "follow the settlements" doctrine is similar if not identical to, the "follow the fortunes" doctrine). <u>But see</u> Louis Torch, <u>An Examination of Reinsurer's Associations in Underlying Claims: The Iron Fist in the Velvet Glove</u>, 3 Pierce L. Rev. 331, 343 (stating that a "follow the forms" clause should not be confused with a "follow the fortunes" clause or a "follow the settlements" clause). Though there are significant distinctions between the doctrines that may be of note as the case proceeds, for ease reference the Court will refer to the notion generally as "follow the fortunes" throughout this report and recommendation.

issues because: 1) Plaintiff did not receive late notice, and even if Plaintiff received late notice, Plaintiff waived its late notice defense when it denied coverage; 2) Defendant's allocation of the Lindsay Claim is rational, and, because the follow the fortunes doctrine is applicable in this case, Plaintiff is bound by that allocation; and 3) if late notice is not waived, Plaintiff has the burden of proving prejudice due to late notice, which it has not met.

Defendant's cross motion mirrors its opposition to Plaintiff's motion; thus, Defendant asks the Court to grant summary judgment on two issues.  First, Defendant asks the Court to find that its allocation of the Lindsay Claim was rational and that Plaintiff is bound to follow it under the follow the fortunes doctrine. Secondly, Defendant contends that its notice to Plaintiff was timely, and if not, that Plaintiff has not proved prejudice, but in any event that Plaintiff waived its late notice when it denied coverage.

Plaintiff responds that Defendant is not entitled to summary judgment as a matter of law on these issues because: 1) the follow the fortunes doctrine is inapplicable in this case because the Reinsurance Certificates at issue do not contain such a clause and such clauses are not, as a matter of law, implied in reinsurance agreements; 2) even if a follow the fortunes doctrine were implied, Defendant's allocation of a portion of the Lindsay Claim settled to the coverage period covered by Plaintiff's reinsurance was in bad faith; and 3) Plaintiff has a valid late notice defense as it received late notice and was prejudiced by it.

For the reasons set forth below, the Undersigned reports and recommends that parties' Motions for Summary Judgment (Dkts. 71 and 72) be **DENIED**.

### 1.    The Reinsurance Certificates

As a preliminary matter, the Court notes that the Reinsurance Certificates at issue

are extremely brief, almost skeletal. Each certificate is two pages in length and neither contains standard contract provisions that a Court would usually look to for contract interpretation guidance. (Dkt. 38, Amend. Compl., Exs. C and D). For example and significantly, the Reinsurance Certificates do not contain clauses addressing choice of law, forum selection, or arbitration.

### 2.    Notice Procedures

The Reinsurance Certificates themselves do not contain specific procedures or criteria for notification of claims other than the following general language from Paragraph V of the Reinsurance Certificates stating, in pertinent part:

> The Reinsured [Defendant] agrees that it will . . . give prompt notice to the Corporation [Plaintiff] of any occurrence, medical incident, event or development, including any change in the Reinsured's applicable loss reserves, which in the judgment of the Reinsured might result in a claim for indemnity hereunder, and will forward promptly to the Corporation copies of such pleadings and reports of investigation as may be requested by the Corporation. The Reinsured shall notify the Corporation of any offer of settlement which exceeds the Reinsured's retention whether received by or to be made by the Reinsured, in advance of the Reinsured's  accepting or making any such offer.

(Dkt. 38, Amend. Compl., Exs. C and D).

The word "occurrence," as used within the 1996 Certificate has the same meaning ascribed to it in the 1996 Umbrella policy (Plaintiff's Ex. B).  Defendant's 1996 Umbrella Policy defined occurrence as:

> "Occurrence:" With respect to coverage I(A) [personal injury] and I(B) [property damage] "Occurrence" shall mean an accident or event including continuous or repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected or intended from the standpoint of the INSURED.   For the purposes of determining the limit of the COMPANY'S liability, all PERSONAL INJURY or PROPERTY DAMAGE arising out of continuous or repeated exposure to the substantially same general conditions shall be considered as arising or

of one OCCURRENCE."

(Plaintiff's Statement of Undisputed Facts at p. 10 (citing to Defendant's 1996 Umb. Policy, Ex. A at p. 5).

### 3.     The Nature of Reinsurance Contracts

Primary insurers reinsure to diversify risk. The mechanics of reinsurance can be simply described. One insurer (a "ceding insurer") "cedes" all or part of the risk relating to a policy, or a group of policies, to a reinsurer. A portion of risk not "ceded" is "retained." The reinsurer agrees to indemnify the ceding insurer for any liability incurred that is covered by the reinsurance. The relationship created is strictly one of indemnification. The reinsurer has no privity with, and is generally not liable to, the original purchaser of the underlying policy. See Delta Holdings, Inc. v. National Distillers , 945 F.2d 1226, 1229 (2d Cir. 1991), cert. denied , 503 U.S. 985 (1992); Unigard Sec. Ins. Co., Inc. v. North River Ins., 4 F.3d 1049, 1053 (2d Cir. 1993). Stated differently, reinsurance is basically insurance for insurance companies, under which the reinsured pays the reinsurer to assume part or all of a risk.  American Bankers Inc. Co. of Florida v. Northwestern National Ins. Co., 198 F.3d 1332 (11th Cir. 1999).

There are two broad categories of reinsurance contracts: facultative and treaty. Facultative reinsurance covers part or all of an individual policy. Treaty reinsurance covers specific classes of a ceding insurer's portfolio of contracts. See Unigard, 4 F.3d at 1053-4. The case before the Court involves two facultative reinsurance policies.

Reinsurance is feasible only if its associated costs are less than those undertaken by the underlying insurer. Unigard, 4 F.3d at 1054. Reinsurers thus generally do not duplicate the functions of the ceding insurers, such as evaluating risks and processing

claims. Reinsurers may not even have actuarial expertise. See Delta, 945 F.2d at 1229 and 1241. Instead, they typically rely on their common interest with the ceding insurers and on an industry custom of utmost good faith, including the sharing of information. See Unigard, 4 F.3d at 1054 and Note, Utmost Good Faith in Reinsurance: A Tradition in Need of Adjustment, 41 Duke L.J. 1548, 1558-61 (1992). Reinsurers depend on ceding insurers to provide information concerning potential liability on the underlying policies. See generally Unigard, 4 F.3d at 1049. Any of these "typical" attributes of reinsurance contracts may be modified, limited or eliminated by the terms of the specific contract at issue.

Despite differences between primary insurance contracts and reinsurance contracts, reinsurance contracts are, at bottom, still commercial insurance contracts. See Christiana Gen. Ins. Corp., 979 F.2d at 271 (stating "[s]imply put, reinsurance is a contract by which one insurer insures the risks of another"). Accordingly, "[a] reinsurance contract is governed by the rules of construction applicable to contracts generally." Id. Thus, reference to the contract itself is the first source of resolving disputes arising out of it.

### 4.    Choice of Law

Significantly, in this regard, the 1996 Certificate, the reinsurance certificate at issue in this case does not specify a governing law; thus, the first order of the Court is to determine what law governs interpretation of the 1996 Certificate. This analysis is appropriate because "[r]einsurance contracts are subject to the choice of law rules which apply to contracts generally to determine which jurisdictions's law should govern the dispute." See COUCH ON INSURANCE THIRD EDITION ¶ 9:14 (Thompson/West 2006).

As a federal court sitting in a diversity case, the Court must apply the choice of law rules of the state in which the action was brought.  Klaxon Co. v. Stentor Elec. Mfg. Co.,

313 U.S. 487, 61 S.Ct. 1020 (1941). Florida courts apply the doctrine of *lex loci contractus* to choice of law issues involving contractual disputes.  See Prime Ins. Syndicate v. B.J. Handley Trucking, 363 F. 3d 1089, 1091 (11th Cir. 2004) (stating that *lec loci contractus* is fact-intensive and requires determination of where the last act necessary to complete the contract is done).  *Lex loci contractus* provides that the laws of the jurisdiction where the contract was executed governs interpretation of the substantive issues regarding the contract.  Id. at (citing Lumbermen's Mut. Cas. Co. v. August, 530 So.2d 293, 295 (1988)).

In this case, the 1996 Certificate is silent as to its place of execution and contains no specific choice-of-law provision. In addition, the parties have not provided any record evidence of the situs of execution.  With this issue unresolved, it is not possible to resolve this threshold issue.

This is significant to the resolution of the motions because the parties are asking the Court to apply or not to apply the follow the fortunes doctrine to a contract that does not on its face contain such a provision.  Whether Florida, or the law of some other state would direct that the doctrine be "implied" in this context is unclear and has not been addressed by the parties in their voluminous filings.

During oral argument before the Undersigned, counsel for the parties made reference to the "federal common law" of reinsurance and suggested that this "federal common law" would not only be applicable, but controlling in this case.  Plaintiff's counsel suggested that this "common law" is derived from the holdings of cases arising out of the Second Circuit and has been adopted by inference in other federal circuits.

Plaintiff is correct that many reinsurance case decisions are rendered by the Second Circuit. This happenstance is not by design, but rather by default. The State of New York,

which is in the Second Circuit, is the commonly referred to as the "arbitration capital of the world."  Reinsurance Certificates often contain arbitration clauses designating New York as the arbitration venue.  (Notably, this one did not).  When the parties disagree with an arbitration decision, their cases must be filed in the Second Circuit, and whether and to what extent to enforce the arbitration award is generally a question of federal law. However, the fact that there is a large body of reinsurance case law arising from the Second Circuit does not mean that these decisions are binding precedent in the Eleventh Circuit or, in a claim brought in diversity, would constitute the substantive law of the state whose law governs the controversy. Certainly, the Second Circuit's interpretation of any specific provision of a reinsurance contract has not spawned a body of "federal common law" applicable throughout the country as suggested by the parties here. Defendants' suggestion, however, that there is a body of federal common law applicable to every reinsurance contract which would provide the relief it seeks here, i.e., that a follow the fortunes clause is inherently implied in every reinsurance contract, has been rejected in courts called upon to consider the issue. See North River Ins. Co. v. Employers Reinsurance Corporation, 197 F.Supp.2d 972, 986 (S.D. Ohio 2002).[6]  In North River the Ohio district court, construing Ohio choice of law rules to apply New Jersey law, held that "a district court sitting in a diversity case must apply the relevant state law in determining whether to imply a 'follow the settlements' obligation." North River, 197 F.Supp.2d. at 985.

The North River court also rejected blind application of other federal decisions,

---

[6] The Eleventh Circuit has noted the policy reasons for enforcing the follow the fortunes doctrine when it is contained in a contract of reinsurance.  See American Bankers Inc. Co. of Florida v. Northwestern National Ins. Co., 198 F.3d 1332 (11th Cir. 1999); however, it has not applied the doctrine in the absence of a contractual provision.  Rather, the Cout assumed "[o]ur starting point is the language of the contract [looking] to ascertain its terms and determine whether it has been breached." Id. at 1334.

opting instead for a case specific, state law specific analysis.  In North River, as in this case, the facultative certificate at issue did not contain a follow the fortunes clause.  Both parties moved for partial summary judgment on the issue of whether the follow the fortunes doctrine should be implied in the facultative reinsurance certificate.  Id. at 976-77.  Plaintiff, North River Insurance Company, argued that the follow the fortunes doctrine was implicit in every reinsurance contract by reason of custom and practice in the industry.  Id. at 978.  Defendant, Employers Reinsurance Corporation ("ERC") argued that no such custom and practice existed and that absent an explicit follow the fortunes clause, the contract could not be governed by that principle.  Both North River and ERC presented case law and expert witness affidavits in support of their positions.

Based on the parties' presentations, the North River court concluded that genuine issues of material fact precluded ruling as a matter of law on the issue for either party.  Id. at 991.  Specifically, the court found that if the cedent failed to bargain for a follow the fortunes provision, it should be held to its decision not to procure one unless there is some other proof that a follow the fortunes provision was the intent of the parties.  See North River v. ERC, 197 F.Supp.2d at 978-79, 990 (holding that when no language within the insurance contract could be construed as a follow the fortunes clause, the implication of the clause into the contract by custom and usage was a question of fact).[7]

In reaching this decision, the North River court cited National American Ins. Co. of Cal. v. Certain Underwriters at Lloyd's London, 93 F.3d 529 (9th Cir. 1996) which also held that whether a "follow the settlements" clause could be read into the reinsurance certificate

---

[7] The case went to trial on that issue.  See North River Ins. Co. v. Employers Reins. Corp., 2002 U.S. Dist. Lexis 11711 (S.D. Ohio, June 2, 2002) (finding that the language of the certificate did not obligate the reinsurer to indemnify the insurer for settlements of claims not covered by its policy, and there was no custom or practice in the reinsurance industry that a reinsurer would be obligated to do so).

as a matter of custom or usage in the reinsurance industry was a question of fact to be determined under the state law applicable to the contract dispute.

These cases recognize that the construction of contract provisions, whether insurance contracts or contracts of other types, is an inherently case specific endeavor, requiring the presiding court to consider the precise contractual provisions at issue, which often differ from contract to contract. As noted, the "provision" sought to be construed and applied here is not even contained in the contract before this Court, nor is it clear from the parties' pleading exactly which provision - "follow the forms," follow the settlements" or "follow the fortunes" is implicated.

Accordingly, the Undersigned recommends that this Court find that there is no "federal common law" of reinsurance contracts that controls the outcome of this case. The matter is properly resolved applying the appropriate state law, which remains in dispute, to the sparse terms of the contract at issue.

Because there remains a factual dispute concerning the applicable state law, it is not possible to resolve any of the remaining issues the parties seek to have resolved. With respect to late notice and the relative burdens applicable to the parties, those are matters resolved with reference to applicable state law. Just by way of example, in the context of a primary insurance contract, apparently Florida law "presumes that an insurer is prejudiced by failure to give prompt notice of a claim, with the burden placed on the insured to rebut that presumption. . ." Allstate Insurance Co. v. Occidental International, Inc., 140 F.3d 1, 3 (1st Cir. 1998). The Florida Supreme Court has reasoned that the "(b)urden should be on the insured to show lack of prejudice where the insurer has been deprived

of the opportunity to investigate the facts and examine the insured." <u>Bankers Insurance</u> <u>Co. v. Macias</u>, 475 So. 2d 1216, 1218 (Fla. 1985). In this regard, unlike a typical reinsurance contract, the contract at issue in the case *sub judice* reserved for Plaintiff the right to participate in the investigation and litigation of the claims. <u>See</u> the 1996 Certificate, ¶ V. Moreover, although <u>Bankers Insurance</u> involved a dispute over a personal injury protection policy, the Florida Supreme Court has noted that the same presumption should apply to claims under other policies as well. <u>Id</u>. By comparison and only by way of example, were this case decided under Alabama law it would appear that the reinsurer would have to prove prejudice.[8] How other states would view this issue varies. <u>See</u> <u>Midwest Employers Casualty Co. v. East Alabama Health Care</u>, 695 So. 2d 1169, 1172 (Ala. 1997)(citing to the survey of law conducted Barry R. Ostrager and Thomas R. Newman, HANDBOOK ON INSURANCE COVERAGE, § 4.04 (8th ed. 1995) on notice and related issues).

Further, even the question of the contractual obligation of notice under the contract at issue here requires resort to state law in this case. Here, Plaintiff contends subsequent agreements among the parties created heightened notice obligations. Whether resort to these subsequent agreements is appropriate implicates issues of contract ambiguity, contract modification, consideration of parol evidence, etc., which, again, differ from state to state.

As noted, in the absence of a contractual provision, any follow the fortunes considerations also must be resolved by reference to applicable state law. For example,

---

[8] <u>See</u> <u>Midwest Employers Casualty Co. v. East Alabama Health Care</u>, 695 So. 2d 1169 (Ala. 1997) stating on a certified question from the United States District Court that while the a primary insurer need not show prejudice under Alabama law, a reinsurer would have such a duty. Again, however, the policy at issue in <u>Midwest</u> expressly disclaimed that the reinsurer had any duty to be responsible for or involved in the investigation and litigation of the claim. <u>Id</u>. at 1173, n.7.

if State X implies the follow the fortunes doctrine in reinsurance contracts and its laws apply, this Court would be bound to apply such a doctrine.  However, if State X follows the court's approach in <u>North River</u>, that is, looking to the terms of the contract, evaluating expert opinions and considering custom and usage to determine if such a clause were intended to be included, the Court would be bound by that procedure and such evidence is not before this Court.  If State X confines consideration to the four corners of the contract to determine its meaning, because no follow the fortunes clause exists here, the doctrine could not be applied in this case.  In that event, the duty of good faith inherent in every contract might bear more heavily on the issues presented.

Because this Court has no clear information from the 1996 Certificate or undisputed information from the parties to this case as to the applicable state law that applies, summary judgment cannot be granted.

**Conclusion**

Based on the above, the Undersigned respectfully reports and recommends that the parties' Motions for Summary Judgment (Dkts. 71 and 72) be **DENIED**.

**RESPECTFULLY RECOMMENDED** in Tampa, Florida on this 30th day of January 2006.


Copies to:    Judge Elizabeth Kovachevich
              Counsel of Record

MARY S. SCRIVEN
United States Magistrate Judge

19